IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 09-cv-01461-PAB-KMT

CHRISTINA PAVELKO,

      Plaintiff,

v.

BREG, INC., a California corporation,

      Defendant.
_____

## ORDER GRANTING SUMMARY JUDGMENT
_____

      This matter is before the Court on defendant's motion for summary judgment [Docket No. 81] and its seven motions to exclude expert testimony [Docket Nos. 82, 83, 84, 85, 86, 87 and 150]. These motions are fully briefed and ripe for disposition. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 based on diversity of citizenship.

      As the Court finds that the risk of pain pumps to cartilage was not foreseeable to defendant at the time of plaintiff's surgery, it will grant the summary judgment motion on issues not related to causation. Therefore, the Court need not address the admissibility of plaintiff's causation experts and will only discuss the merits of defendant's summary judgment motion.

## I.  BACKGROUND[1]

This is a negligence and products liability case wherein plaintiff alleges defendant's pain pump caused decay of the cartilage in her shoulder and thereby permanent injury.   Plaintiff's claims raise issues regarding the FDA approval process, the state of medical knowledge at the time of plaintiff's surgery, and the reliance of plaintiff's doctor on Breg's marketing.

### A.  <u>Plaintiff's Surgery and Subsequent Injury</u>

On June 27, 2003, Dr. John Papilion performed surgery on plaintiff's right shoulder at the Dry Creek Surgery Center in Englewood, Colorado.  After her surgery, Dr. Papilion prescribed and implanted the catheter of a Breg Pain Care 3000 ("PC 3000") inside her joint.  The PC 3000 is a medical device, referred to as a "pain pump," prescribed after surgery and designed to provide a continuous flow of anesthetic into the operative site in order to alleviate the patient's pain.  Patients use pain pumps for two to three days post-surgery.

Around six to eight weeks after her surgery, plaintiff began to complain of worsening pain in her shoulder.  In March 2006, thirty-three months after her initial surgery, plaintiff saw Dr. Thomas Noonan.  Dr. Noonan diagnosed her as having chondrolysis, a condition evidenced by the breakdown of the cartilage in plaintiff's shoulder joint.  Dr. Noonan does not recall if he talked to plaintiff about the association between pain pumps and chondrolysis.  Plaintiff testifies that no doctor ever discussed the relationship between her pain pump and her shoulder condition with her and that

---

[1] Unless otherwise indicated, the following facts are not in dispute.

she did not learn about the possible association until she saw an advertisement on TV.

Plaintiff's mother has testified that plaintiff told her that plaintiff's injury was caused by

her pain pump in 2006 and that plaintiff learned this fact from Dr. Noonan.

### B.   The FDA Approval Process

Before marketing a medical device in the United States, a manufacturer is

required to obtain clearance from the Food and Drug Administration ("FDA").   The FDA

classifies devices into three categories: "Class I devices are those that present no

unreasonable risk of illness or injury and therefore require only general manufacturing

controls; Class II devices are those possessing a greater potential dangerousness and

thus warranting more stringent controls; Class III devices 'presen[t] a potential

unreasonable risk of illness or injury.'" *Buckman Co. v. Plaintiffs' Legal Committee*, 531

U.S. 341, 343 (2001) (citing 21 U.S.C. § 360c).   The FDA requires manufacturers of

Class III devices to complete a rigorous premarket approval ("PMA") process, wherein

the manufacturer must submit extensive testing of the product to the FDA.   *See id.*

Class II devices, on the other hand, are subject to a less rigorous clearance process

involving what is referred to a as a "510(k) submission."   This submission demonstrates,

among other things, that the device is substantially equivalent to a device already

legally being marketed and includes an "indications for use" statement describing the

intended uses of the device.   *See* 21 U.S.C. § 360c(i).

On July 7, 2000, defendant filed a 510(k) submission for the PC 3000.   During

the 510(k) process, FDA nurse consultant Irene Naveau requested that defendant

remove references to orthopedic procedures in its submission because orthopedic

procedures were not included in its "indications for use" statement and earlier pain pumps had been cleared for general surgical use.  Docket No. 162-1 at 39.  The FDA cleared the PC 3000 for distribution in September of that year according to the following indications for use: "BREG's Pain Care 3000 is intended to provide continuous infusion of a local anesthetic into an intra-operative site for the post-operative management of pain."  Docket No. 81-2 at 12.

C.   **Medical Understanding of Risks Associated with Intra-Articular Use[2] of Pain Pumps**

At the time of plaintiff's surgery, no clinical reports associated pain pumps with chondrolysis.  *See* Docket No. 81-8 at 36.  The first cases of chondrolysis following arthroscopic surgery were reported in 2004.  *See* Docket No. 81-9 at 4.  In March 2006, nearly three years after plaintiff's surgery, Dr. Brent Hansen made one of the first public presentations suggesting a link between the continuous infusion of anesthetic into the joint space and chondrolysis.  Docket No. 106 at 2.

Plaintiff presents a number of articles purporting to demonstrate that, prior to her surgery in 2003, medical literature documented the risk of injecting foreign substances into joints.  The Court summarizes these articles as follows:

- J. Albert Key, *The Production of Chronic Arthritis by the Injection of Weak Acids, Alkalies, Distilled Water, & Salt Solution into Joints* (1932).  Reports that repeated injection of "weak acids, weak alkalies, distilled water, or salt solution" caused cell death in intra-articular cartilage.  Docket No. 110-7.

- A. Maroudas, *Transport of solutes through cartilage: permeability to large molecules* (1975).  Explores the permeability of cartilage to large molecules.  Docket No. 110-8.

---

[2] "Intra-articular use" refers to use inside the joint space.

4

•   Roberta Nole, et al., *Bupivacaine & Saline Effects on Articular Cartilage* (1985).  Concludes that "[b]upivacaine itself seems to be fairly well tolerated by articular cartilage, but the saline solution in which it is prepared is transiently inhibitory of the uptake of sulfates in articular cartilage" and that "there does not appear to be any immediate need to stop the use of intraarticular bupivacaine." Docket No. 110-9.

•   A. Minerva Garcia et al., *Transport and binding of insulin-like growth factor I through articular cartilage* (2003).  Develops theoretical model for the role of insulin-like growth factor binding proteins in cartilage.  Docket No. 110-10.

•   Kazuya Tamai, et al., *Chrondrolysis of the shoulder following a "color test"-assisted rotator cuff repair - a report of 2 cases* (1997). Concludes that the use of gentian violet color test in rotator cuff surgery may cause chondrolysis.  Docket No. 110-11.

•   Yasuaki Nakagawa, et al., *Glenohumeral Osteoarthritis Following a "Color Test" during Rotator Cuff Repair* (1998).  Concurs with Tamai study's conclusions.  Docket No. 110-12.

•   Y. Shibata, et al., *Chondrolysis of the glenohumeral joint following a color test using gentian violet* (2001).  Case study of same. Docket No. 110-13.

•   Christopher J. Hogan, *Progressive Articular Cartilage Loss Following Radiofrequency Treatment of a Partial-Thickness Lesion* (2001).  Suggests a link between cartilage thinning and radiofrequency treatment for partial-thickness lesion.  Docket No. 110-14.

•   Ryland B. Edwards, *Thermal Chondroplasty of Chondromalacic Human Cartilage* (2002).  Calls into question the use of thermal chondroplasty, a treatment using radiofrequency.  Docket No. 110-15.

**D.**   **Dr. Papilion**

Dr. Papilion, an orthopedic surgeon, began using pain pumps in orthopedic

surgeries in the mid-1990s.  He believed it was safe to place the catheter of a pain

pump inside the joint space in part because defendant had represented to him that such placement was safe.  Docket No. 111-18 at 7-8.  Dr. Papilion testified that he understood defendant's materials directing physicians to insert the catheter of the pain pump into the surgical site or wound site to include insertion into the joint space. Docket No. 111-18 at 15-16.

## II.  STANDARD OF REVIEW

"In diversity cases like this one, the substantive law of the forum state governs the analysis of the underlying claims . . . but [federal courts] are governed by federal law in determining the propriety of . . . summary judgment."  *Hill v. Allstate Ins. Co.*, 479 F.3d 735, 739 (10th Cir. 2007) (internal quotations omitted).  According to Federal Rule of Civil Procedure 56, a court should grant summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986).  A movant who bears the burden at trial must submit evidence to establish every essential element of its claim.  *In re Ribozyme Pharms., Inc. Sec. Litig.*, 209 F. Supp. 2d 1106, 1111 (D. Colo. 2002).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see* Fed. R. Civ. P. 56(c).

Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & County of Denver,* 423 F.3d 1192, 1198 (10th Cir. 2005).  A disputed fact is "material" if under the relevant substantive law it is

essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.,* 259 F.3d 1226,

1231-32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead

a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee,* 119

F.3d 837, 839 (10th Cir. 1997).  When reviewing a motion for summary judgment, a

court must view the evidence in the light most favorable to the non-moving party.  *Id.*;

*see McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).

## III.  DISCUSSION

### A.  <u>Statute of Limitations</u>

As a threshold matter, defendant argues that plaintiff's two claims negligence

and design defect, are time barred under Colorado law.  It is undisputed that Colorado

law sets a two year statute of limitations for strict liability, negligence, and failure to

warn claims.  *See* Colo. Rev. Stat. §§ 13-80-102 and 13-80-106.  Colorado also applies

a discovery rule, whereby a cause of action does not accrue until "both the injury and its

cause are known or should have been known by the exercise of reasonable diligence."

Colo. Rev. Stat. § 13-80-108(1).  "The time when a plaintiff discovered, or through the

use of reasonable diligence should have discovered, the negligent conduct is normally

a question of fact that must be resolved by the trier of fact."  *Salazar v. American*

*Sterilizer Co.*, 5 P.3d 357, 363 (Colo. App. 2000).

Plaintiff's surgery occurred in June 2003 and she began to suffer renewed pain

in her shoulder six to eight weeks afterwards.  However, she did not file this suit until

June 2009, six years later.  Plaintiff testified that she first discovered her pain pump was

the cause of her chondrolysis in March 2008 when she saw an advertisement on

television.  *See* Docket No. 81-11 at 10; Docket No. 111-25 at 2.  Defendant argues that plaintiff undisputably discovered her injury in 2006 when she saw Dr. Noonan and he diagnosed her with chondrolysis.  Defendant also contends that plaintiff should have known the cause of her injury through this same visit because she should have asked Dr. Noonan what caused her chondrolysis.  Based on Dr. Noonan's testimony, he would have told her that it may have been her pain pump.[3]

Defendant's argument rests on the idea that "exercise of reasonable diligence" includes a duty to ask your physician about the potential cause of an injury.  Defendant cites *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 887 (10th Cir. 2005), for the proposition that "[o]nce a plaintiff has suspicion of wrongdoing, she is under a duty to attempt to find the facts."  Defendant, however, does not present facts showing that plaintiff here should have had any "suspicion of wrongdoing" or that plaintiff had knowledge of facts that would have put her on notice that her chondrolysis was caused by "the wrongful conduct of another."  *See Mastro v. Brodie*, 682 P.2d 1162, 1168 (Colo. 1984).  Therefore, defendant has not met its burden and an issue of fact remains as to when plaintiff should have discovered her cause of action.

---

[3]  Defendant cites to *Dittman v. DJO, LLC*, No. 08-cv-02791-WDM-KLM, 2009 WL 3246128 (D. Colo. Oct. 5, 2009), for the proposition that a doctor's advising a patient that a pain pump may have caused his chondrolysis was sufficient under the Colorado discovery rule to start the statute of limitations period.  Here, however, whether Dr. Noonan actually told plaintiff that her pain pump was a potential cause of her chondrolysis is disputed.  Dr. Noonan testifies that he does not recall specifically telling plaintiff about the possible association between pain pumps and chondrolysis.  Docket No. 81-11 at 19.  Plaintiff's mother testifies that plaintiff told her the medicine from her pain pump caused her chondrolysis in 2006 and that plaintiff received this information from her doctor.  Docket No. 81-11 at 14.  Plaintiff testifies that Dr. Noonan only explained to her what chondrolysis is and that no physician ever told her that her chondrolysis was related to her use of a pain pump.  Docket No. 81-11 at 9.

**B.  Negligence**

Plaintiff's first claim alleges that defendant knew or reasonably should have known that its pain pump was unreasonably dangerous when used inside joints and defendant was therefore negligent in failing to warn the medical community that it had not established the safety of this use; failing to instruct against placing the catheter of pain pumps in joints; failing to test the use of its pain pumps in joints; and designing and promoting pain pumps for intra-articular use.  In order to succeed on her negligence claim, plaintiff must show that defendant breached a duty of care owed to plaintiff.  "A legal duty to use reasonable care arises in response to a foreseeable risk of injury to others."  *Palmer v. A.H. Robins Co., Inc.*, 684 P.2d 187, 209 (Colo. 1984).  "When a manufacturer or seller knows or should know of unreasonable dangers associated with the use of its product and the dangers are not obvious to product users, a manufacturer has an obligation to warn of the dangers and a breach of that obligation constitutes negligence."  *Mile Hi Concrete, Inc. v. Matz*, 842 P.2d 198, 202 (Colo. 1992) (citing *Palmer*, 684 P.2d at 198).  Here, defendant was negligent if it did not exercise reasonable care in marketing, selling, and labeling its product.  *See id*. at 202. Defendant will be held to the standard of care of a reasonably prudent medical device manufacturer under the same or similar circumstances.  *See Palmer,* 684 P.2d at 210.

Defendant argues that it could not have been negligent in its design and marketing of the PC 3000 because it is undisputed that no one reported any suspicion of a potential connection between continuous intra-articular infusion of anesthetics and chondrolysis until 2006, three years after plaintiff's surgery.  Therefore, the risk

associated with this use was entirely unforeseeable, and defendant did not breach any duty by not warning doctors about it.  But plaintiff's negligence claim is not based on a theory that defendant actually knew of the risk to joints when it first marketed the PC 3000; rather, plaintiff contends that defendant should have known about this risk. Plaintiff asserts that defendant had a duty to disclose those risks that would have been revealed by "reasonable testing."  *See* Restatement (Third) of Torts: Prod. Liab. § 2 Comment m.  According to plaintiff, this "reasonable testing" should have included tests designed to confirm that intra-articular infusion of local anesthetics was safe.  Plaintiff specifically contends that defendant breached the standard of care by continuing to market the PC 3000 for orthopedic use and not conducting additional testing on joints in light of: (1) medical literature showing that aesthetics were toxic to cartilage; and (2) the FDA's denial of defendant's request for orthopedic indications.

### 1. Medical Literature

Plaintiff argues that the medical literature available prior to plaintiff's surgery should have put defendant on notice that more extensive testing of joints was necessary.  In support of this argument, plaintiff submits a series of articles written before 2003 in her response to defendant's motion for summary judgment.  *See* Docket Nos. 110-7; 110-8; 110-9; 110-10; 110-11; 110-12; 110-13; 110-14; 110-15.  Similar arguments and articles were presented in *Krumpelbeck v. Breg*, ---- F. Supp. 2d ----, 2010 WL 5475616 (S.D. Ohio Dec. 27, 2010), and *Monroe v. Zimmer*, 2011 WL 534037 (E.D. Cal. Feb. 14, 2011).  Both of these courts rejected the argument that the literature suggests further testing was necessary at least in part based on the plaintiff's failure to

10

submit any expert testimony explaining and analyzing the relevance of these articles. *See Krumpelbeck,* 2010 WL 5475616 at *7-*8; *Monroe,* 2011 WL 534037 at *19. Plaintiff here has similarly failed to submit expert testimony supporting her argument that these nine articles would have placed a reasonably prudent medical device manufacturer on notice that further testing of cartilage was required.  In Colorado, expert testimony is not always required to establish the standard of care where determining a breach "does not entail specialized knowledge or skill unique to a scientific discipline and beyond the knowledge and experience of the average jury." *Palmer*, 684 P.2d at 210.  The standard of care regarding the PC 3000 is not so obvious.  The articles submitted by plaintiff discuss complex medical issues that require expert analysis of their conclusions and explanation of how these conclusions would have compelled a reasonable manufacturer to investigate further.  *See Monroe,* 2011 WL 534037 at *19.  Therefore, the Court, like the court in *Krumpelbeck,* is reluctant to rely on the mere assertion that these articles "should have raised concerns or at least motivated" defendant to conduct additional testing.  *See* Docket No. 106 at 6; *Krumpelbeck,* 2010 WL 5475616 at *7-*8.

Moreover, the Court has examined the articles and does not agree with plaintiff that they would have put a reasonable device manufacturer on notice of any risks that required additional investigation or warnings.  Eight out of the nine articles are largely irrelevant, relating primarily to substances other than anesthetics.  A 1985 article titled "Bupivacaine and Saline Effects on Articular Cartilage"[4] does discuss the common

---

[4] Plaintiff alleges that the PC 3000 used following her surgery was filled with bupivacaine.  *See* Docket No. 149 at 2, ¶ 6.

practice of injecting local anesthetic into joints "during or at the conclusion of an arthroscopic procedure." Docket No. 110-9 at 2. This article concludes that "[b]upivacaine itself seems to be fairly well tolerated by articular cartilage, but the saline solution in which it is prepared is transiently inhibitory of the uptake of sulfates in articular cartilage" and that "there does not appear to be any immediate need to stop the use of intraarticular bupivacaine." Docket No. 110-9 at 5. The Court agrees with the analysis of this article in *Rodriguez v. Stryker Corp.*, 2011 WL 31462 (M.D. Tenn. Jan. 5, 2011), and concludes that it does not raise a genuine issue of material fact as to whether defendant should have been on notice of the potential dangers of continuous infusion of anesthetics into the joint space.[5]

### 2. FDA Approval

Plaintiff argues that defendant had a duty to conduct further testing on joints or warn that the PC 3000 was not safe for intra-articular use based on the FDA's communications with defendant during the clearance process. Specifically, plaintiff claims that the FDA refused to clear defendant's pain pumps for orthopedic use several times and that, when considering approval of the PC 3000, nurse consultant Irene Naveau advised defendant that:

> As with the Pain Care 2000, pumps of this nature are cleared for general surgical use. Your comparison to the PainBuster and SurgiPeace includes the indications for use with orthopedic procedures which is not included in your Indications for Use. Correctly, since this indication is not

---

[5] As *Rodriguez* explains, *Koch v. Breg*, 2010 WL 5301047 at *2 (D.S.D. Dec. 20, 2010), found that the 1985 article, along with expert testimony explaining it, was sufficient to create a genuine dispute as to the foreseeability of the risk to cartilage. Here, plaintiff has provided no expert testimony explaining the significance of the 1985 article.

12

in your Indications for Use statement, it should not be used in other sections of your submission.  It is recommended that any reference to orthopedic procedures be deleted.

Docket No. 162-1 at 39.  Defendant subsequently removed these references to orthopedic procedures.  According to plaintiff, defendant was negligent in continuing to market the PC 3000 to orthopedic surgeons like Dr. Papilion and in instructing that the catheter could be placed in the joint space when it knew that the FDA had disapproved this use "based on the lack of safety data."  Docket No. 106 at 11.

Plaintiff does not present sufficient evidence for this theory to survive summary judgment.  First, plaintiff presents no evidence that the FDA ever advised defendant it was denying marketing requests because of a "lack of safety data" or otherwise suggested that defendant's testing was inadequate.  After briefing on defendant's summary judgment motion was complete, plaintiff submitted a memo from Irene Naveau stating that another pain pump manufacturer, I-Flow, sought clearance for intra-articular use but that this request was not accompanied by "data to demonstrate that this device may be used safely and effectively with this use."  Docket No. 156-3 at 4.  Putting aside plaintiff's failure to state any reason why this document, along with her other "newly discovered evidence," could not be produced earlier, plaintiff has provided no evidence suggesting that defendant had any knowledge of this memo or was ever similarly advised by the FDA.  The memo regarding I-Flow is therefore irrelevant to plaintiff's claim.

Second, plaintiff does not present competent evidence tending to show that defendant was negligent by continuing to market the PC 3000 to orthopedic surgeons and by instructing that the device's catheter could be placed in the joint space after

13

Irene Naveau instructed defendant to remove references to orthopedic procedures in its 510(k) submission.  Defendant presents an expert affidavit stating that the FDA clearly approved the pain care line for orthopedic use based on its 510(k) submission and that the FDA's request that defendant remove the word "orthopedic" from specific comparative tables had no effect on defendant's intended use of the PC 3000.  Docket No. 141-6 at 12-13.  This affidavit also explains that the FDA tries to avoid specific indications for use of general use devices and this general use approval intentionally allowed doctors flexibility in deciding where to place the catheter.  *Id.* at 10-11.

Plaintiff presents no admissible evidence contradicting this affidavit in response to defendant's motion for summary judgment.  Unlike the plaintiff in *Monroe*, plaintiff did not submit expert testimony establishing that defendant marketed the PC 3000 for a purpose that was not cleared by the FDA or that defendant was obligated to undertake more extensive testing before marketing the device for intra-articular use.  *See* 2011 WL 534037 at *22.  Plaintiff's only evidence relevant to this argument is an unsworn expert report from Dr. Suzanne Parisian, *see* Docket No. 114-4, and recent bulletins from the FDA's website.  *See* Docket Nos. 111-5, 111-6.  The Parisian report, beyond being unsworn, is irrelevant to this case as it only addresses other pain pump manufacturers' FDA approval process and not defendant's.  The FDA bulletins are also inadmissible hearsay, offered to prove that the FDA did not approve the PC 3000 for intra-articular use, and plaintiff does not present any expert testimony through which these reports could be admitted.  *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would

14

be admissible in evidence.").  Finally, plaintiff submitted testimony from her own experts

that they understood "intraoperative site" to include joint space, suggesting that the FDA

clearance could reasonably be understood to include this use.  See Docket No. 111-20

at 9; 111-21 at 3.

Accordingly, plaintiff's argument that she should be afforded a presumption of

negligence fails.  See Colo. Rev. Stat. § 13-21-403(2) ("noncompliance with a

government code, standard, or regulation existing and in effect at the time of sale of the

product by the manufacturer which contributed to the claim or injury shall create a

rebuttable presumption that the product was defective or negligently manufactured").

As defendant points out, a plaintiff is only entitled to this presumption where "the court

determines by a preponderance of the evidence that the necessary facts giving rise to a

presumption have been established."  Colo. Rev. Stat. § 13-21-403(4).  Here, plaintiff

has not only failed to show by a preponderance of the evidence that defendant did not

comply with FDA regulations, she has failed to introduce sufficient evidence to create a

question of material fact on the issue.

### 3.  *Inadequate Testing*

Plaintiff's negligence claim also rests on her allegation that defendant did not

adequately test the PC 3000.  Here again, plaintiff presents no expert testimony to

support this allegation and rests on the argument that defendant should have

conducted the more extensive testing required for Class III devices.  Plaintiff provides

nothing to contradict defendant's evidence that it thoroughly tested its pain pumps and

thoroughly investigated all possible risks associated with their use.  See Docket Nos.

141-4; 141-5.  Moreover, despite plaintiff's claim that "Breg did not test its device for the

uses for which it would be marketed," Docket No. 106 at 11, defendant submitted evidence showing that it conducted design validation studies and field trials involving the administration of local anesthetics delivered into the shoulder and knee. *See* Docket No. 141-16 at 14-16.

Plaintiff presents no evidence suggesting that a reasonable device manufacturer would have designed a test specifically aimed at investigating whether pain pumps could cause chondrolysis. Moreover, plaintiff provides no evidence of scientific studies or public presentations linking chondrolysis and intra-articular infusion of anesthetics before her surgery in 2003. As in *Krumpelbeck*, at "the time of Plaintiff's surgery, the now-purported association between chondrolysis and anesthetic infusion in the shoulder joint was unknown to Defendant, and indeed, to the entire medical scientific community." *See* 2010 WL 5475616 at *13. Therefore, a rational jury could not find that defendant's testing or warnings were negligent, and the Court will grant summary judgment on plaintiff's negligence claim.[6]

## C. Strict Products Liability

Plaintiff also asserts a claim for design defect. First, plaintiff alleges that the PC 3000 was unreasonably dangerous as designed because defendant failed to conduct adequate testing of its pain pumps to determine if they were safe for intra-articular use.

---

[6] Plaintiff's citation to *Holder v. Breg*, No. 09-cv-7556 (Denver Dist. Ct. July 6, 2010), does not save her claim. There, a Denver District Court denied summary judgment where plaintiff's surgery occurred in 2005 and plaintiff claimed "that as early as 2004, orthopedic surgeons had started seeing cases of chondrolysis in patients, and at least one publication reported such" and, therefore, genuine issues of material fact existed "as to what facts existed at what time so as to establish the proper duty of care." Docket No. 141-2 at 2-3. In this case, plaintiff's surgery occurred in 2003 and reports or publications in 2004 do not create a similar issue of fact.

This allegation fails for the reasons discussed above.  Second, plaintiff alleges that the PC 3000's labeling was defective because it did not disclose that the safety of the device was not established for use in joints or that such use posed a danger to joint cartilage.  In Colorado, a negligent failure to warn claim is premised on proof that a "manufacturer's failure to warn of a risk fell below an acceptable standard of care." *Fibreboard Corp. v. Fenton*, 845 P.2d 1168, 1175 (Colo. 1993).  But, in a claim for strict liability failure to warn, "the focus of the inquiry is whether the defendant failed to warn of particular risks that were known or knowable in light of the generally recognized and prevailing scientific and technical knowledge available at the time of manufacture and distribution."  *Id.*  However, "[s]trict liability is not absolute liability and a manufacturer is not required to be the virtual insurer of its products."  *Id.*

No evidence suggests that defendant knew of the risk in 2000 when the PC 3000 was first cleared by the FDA or in 2003 when Dr. Papilion performed plaintiff's surgery.  Nor does any evidence suggest it was knowable, as plaintiff provides no evidence showing that the medical community was aware of this risk in 2000 or in 2003.  For much the same reason that the Court finds plaintiff submits insufficient evidence to show that defendant breached the duty of care, the Court also finds that plaintiff has not submitted sufficient evidence to show that the risk of chondrolysis was knowable in light of medical knowledge at the time.  Therefore, defendant had no duty to warn of this risk.  Based on plaintiff's evidence, no rational jury could find that the risk associated with intra-articular use of pain pumps was foreseeable at the time of plaintiff's surgery and, as "[d]uties concerning the design and marketing of . . . medical devices arise only with respect to risks of harm that are reasonably foreseeable at the time of sale,"

17

defendant is entitled to summary judgment on plaintiff's design defect claim.  *See*

Restatement 3d Torts (Products Liability) § 6 Comment g.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendant's Motion for Summary Judgment [Docket No. 81] is

**GRANTED**.  It is further

**ORDERED** that defendant's motions to exclude expert testimony [Docket Nos.

82, 83, 84, 85, 86, 87 and 150] are denied as moot.  It is further

**ORDERED** that judgment shall enter for defendant and against plaintiff.  It is

further

**ORDERED** that the trial preparation conference set for June 10, 2011 and the

trial set for July 11, 2011 are **VACATED**.


DATED February 28, 2011.

BY THE COURT:


 s/Philip A. Brimmer_____
PHILIP A. BRIMMER
United States District Judge